United States of America v. Philip Love, 19-10156. That matter is submitted on the briefs, will be submitted as of this date. The next case is Eric Valadares v. Merrick Garland, 20-72553, submitted on the briefs, will be submitted as of this date. Next case is Carlos Rodriguez Juarez, 20-73815. That case has been submitted on the briefs, will be submitted as of this date. The first matter on for oral argument is Eagle Eye Produce, Inc. v. Agricola Faader SPR de RL, I guess, 21-16274. Each side has 15 minutes, so when you take the podium, I'm assuming these are the individuals that are, I can see you on Zoom. If you have any problems letting, if anyone's got any problems with their audio, let us know. So these are the Good morning. And so we're ready to appellant. Counsel, you can state your appearance and let me how much time you want to reserve. I'm ready for, on Eagle Eye. Okay. Mr. Goldman? Yes, picture. I think we have, I think I'm seeing Mr. Martin. Mr. Martin? Yes, Your Honor. Okay, I'm seeing you. I'm not seeing Mr. Golden right now. There he is. Okay. Everyone see everyone? Okay. So Mr. Goldman, we're ready for you to begin. All right. May it please the court. Robert Goldman on behalf of the appellants in this matter. This appeal is in two parts. One has to do with sanctions order for which the penalty not only does not fit the crime, but it's not related to the crime. And then the second part is the summary judgment that was entered with respect to the sanctions order. The first amended complaint, the operative pleading brought a claim for tortious from a product claim for fraud, fraudulent transfers at count number two. There were three assets that were allegedly transferred. Uh, those assets were farmland. Uh, secondly, a packing house where fresh cut produce would be taken to be packed into boxes. And third, a packing line, which the produce would be run across to be graded. Uh, there were two other assets that were mentioned in the first amended complaint, but they're really it not relevant because one of them is quote supplies and quote, that's a generic term. It could mean anything. It's not described with reasonable particularity. And secondly, few quote future crops and quote, well, future crops don't exist today. That's not an asset that can be transferred. What is telling in this matter is that the first amended complaint did not allege that the appellant Fader, who are referred to as old co transferred those ass permit had titled to those assets. What is not alleged is that Fader transferred those assets to Santa's appellant, Santa Sophia, which I'll label as new co uh, what is alleged is that old co use these assets. New co Santa Sophia then used these assets and new co should have given adequate consideration for those assets to old co no allegations to why it should have basically two issues here. So are you addressing the adverse inference sanctions first? Or how are you approaching your argument? Yes. Yes, I am. The, the, the sanctions order first and then the summary judgment second. Okay, so if we agree with you that the district court issued a terminating sanction, does that necessitate a finding of abusive discretion? Uh, I would suggest that it does because, uh, this goes to the willfulness of, uh, of, uh, the violation. And what I'd like your honors to understand is that the nature of the violation is one in which there was an order compelling my clients to produce all their financial records for 2016, 2017. And the record reflects starting at page 12 in my brief that we produced a tremendous amount of records. Well, I don't think anyone would, well, someone might dispute it, but let's say you produced a lot of documents, but I'm, is it your position that because the withheld documents were quote relevant to the dispute, you were not required to comply with the district courts, uh, January 3rd, 2018 order. And if so, can you explain why not? I mean, you know, if you have an order, I'm not sure, um, it's your determination. Well, you know, I don't think these are relevant, so I'm not going to disclose them even though they're required to be disclosed. Right. So, uh, your honor, I would not take the position in this court or any other that a court order is not required to be complied with. It is what I would take the position is looking at the sheer volume of the documents that were produced, uh, that this court, that there was no finding that it was willfully withheld. In fact, the few documents that were pointed out that still had not been produced were then produced. It was after the discovery deadline, but they were produced. So many of these documents were duplicative because you can have the same information in multiple different forms. And so what I'm suggesting to this court is that there was no finding of willful. There was no hearing the kind of thing that would warrant, uh, the kind of the, the sanction that exists, which as your honors just heard me say a moment ago, there, what did not fit, uh, the non-production it is. I don't know if your honors have realized it, and I probably should have done a better job of pointing this out, but the first amended complaint did not seek to declare that old co and new co were one in the same, the sanction that was be one in the same. That is not a remedy for non-production of a few documents. And it is not a remedy that had been requested in the pleadings. The pleadings only requested monetary damages. They did not even request that this, that the trial court and, or a jury void transfers just monetary. So what I am saying is, is that the sanction is not, was not warranted and there's no finding of willfulness, which as your honor pointed out, that even if, you know, if your honor finds that this is a terminating sanction, that is the requirement. It's abuse of discretion plus. So, so counsel, I'm looking at the district court's, uh, order. This is the one of January 2nd, 2018. And the, the second and third paragraph. So the actually the second and third sentences of the order says defendants admit that to date they have not disclosed all unredacted contracts or agreements and that they offer no reason why they have refused to disclose the relevant information. Those findings, are those findings clear error? Uh, no, no, your honor. The, that is accurate. Please understand that to produce all financial records essentially requires a company to search all its computers, all its phones, all its physical records. Everything in a business is going to say 95% of the information. And of that 95%, it had the remaining 5% in it, just in a different form. When it was pointed out to us that we did not produce a, a diarrhea general, uh, we then went ahead and produced that. What I am suggesting is, is that we negligently did not produce every single document that we had, even though the information was there. And when it was pointed out, sort of cherry picked, you didn't produce this, you didn't produce that, we then produced that. And that is in my brief. Yeah, so I'd like to take you to the summary judgment motion. Um, and, um, the, the, one of the facts that is of greatest concern to me is the, uh, potential relationship between guys. Um, now you've made an allegation that, uh, it was an affirmative defense, I think, uh, that there was, this was a violation of the, um, Commodities, what is it, the Commodities Production Act? Perishable Agriculture. The Perishable Commodities Act, I'm sorry. Uh, the Perishable Commodities Act. Um, what is of concern to me is specifically, and I will be asking, uh, Mr. Martin the same question, uh, is paragraph 17D of the contract. Uh, at the end of 17D, it recites, grower acknowledges and approves the sale of produce to companies related to distributor. And then says specifically, Eagle Eye California and Eagle Eye Farms. Now, that, that seems to to them. So if, if so, what, uh, what argument have you got? Um, and does the word specifically there, uh, limit their sales to Eagle Eye California and Eagle Eye Farms? Well, uh, your Honor, I would suggest that it does. And the fact that it's approved sales does not mean that one can make essentially a hidden profit on those sales. So that if Eagle Eye would have sold, uh, to Vons for $10 a case and instead sold to its related company, Eagle Eye, uh, Grape Guys for, for, uh, $10 and then Eagle Eye Grape Guys sold to Vons for $12. There's a missing $2, a box there that is a hidden profit. That is not one that was approved. Okay. But that wouldn't be a, that wouldn't be a violation of the perishable commodities act, which, which prohibits sales to related companies without specific authorization. So I'm, I'm, I'm focused on the regulations enforcing the act is you've alleged that there's a violation of the act that the fraud question is completely different, but the violation of the act is very, is something, is something else. You know, your Honor, I, uh, have reserved three minutes and I'm going to take a look at that because I believe one of the contracts, there were two seasons and I believe it was one of the two contracts, uh, provided for that. And the other contract did not. And I moved on the part that did not provide that very language that you had read. It seems to me that there's an argument that can be made that you concede that the undisputed material of facts established that plaintiff demonstrated a prima facie case for breach of contract. And if that's the case, can you clarify to me what your argument is that the district court erred in granting partial summary judgment for the plaintiff? Yes. Uh, so what the, what the contract says is that the, uh, consignee, uh, is going to endeavor to get the best prices in the, in the contract. The way to measure the prices that were obtained in the produce industry is by measuring them against the USDA market news reports. We measured them against the USDA market news reports and found that on average there was for the 2014, 2015 season, 422,000 less than the market value from that a juror or jury could infer and find that there was not, uh, an endeavor made to obtain the best prices. That number of 422,000 actually goes up to 826,000. When you talk about, uh, the top of the the average of the market that is a range is given if it's four to six, then the average is the five of the market. What the trial court did in this particular matter is found that the market news prices, the USDA certified market news prices were irrelevant to determining whether or not the consignee, uh, fulfilled its obligations in the contract. That is just not the way that it's done. And you don't have to refer to just produce whenever you've got a consignee and you've got evidence of market news prices, the consignee who's taken on an obligation to get the best prices, their performance can be measured against a objective standard here. That objective standard was the, the, the market news reports, official market news reports. It's done every day by the USDA as to whether or not a marketer has performed. And it, and that is ultimately a jury question. Judge Collins, did you have any questions before he reserves for rebuttal? Um, you're muted. Not at this time. Right. Uh, you want to reserve the two and a half minutes left? Yes, your honor. All right. All right. We'll go to Appelli. To the place, the court. My name is Robert C. Martin. My nickname is Kip, but that's why you see it up on the screen. Uh, I'm the attorney for the Appelli's Eagle Eye Produce. And let me start my presentation with an answer to the last question that the panel asked. The problem with the whole issue on the market news was not that the court rejected the market news reports themselves as somehow unreliable or irrelevant. The problem with the market news was that the analysis that Mr. Goldman outlined was never produced by the, the Appelli's until three months after the court district courts ordered close of discovery on May 9th. And that, that actually was compounded by the fact that about a month before the discovery deadline, Mr. Espinosa, who supposedly did this analysis said that in his deposition that he had the analysis and he never produced it until three months after the discovery deadline. So what the district court or order did on December 9th in granting the motion to strike was not to strike the market news reports. And I've outlined that in the brief. What the district court did was very, very thoroughly analyze what had been offered in response to the motion for summary judgment by Eagle Eye on the contract claim and said the following portions of Mr. Espinosa's affidavit are stricken because they were offered after the court's discovery deadline. It's a very simple rule 37c analysis. So what's your best argument that the sanction imposed was not a terminating sanction? Your Honor, it wasn't a terminating sanction because the August 30th order which you're talking about did not dispose of any liability. There were two counts as Mr. Goldman said, the fraudulent conveyance count and the contract count. Those remained viable after August 30. The liability was not determined until a year and a half later on December 9th. And the parties went through extensive motion practice, discovery, argument between those two periods during that I think the district court was correct in saying this is a factual determination saying that one entity is the successor of the other and it did not dispose of any liability. Now going back to the case that was cited in the brief on whether or not it was a terminating sanction, I would note for the court that the district court had those factors in the motion pleadings before its August 30th order. They were mentioned by the appellants at 6 ER 1260-61 in their opposition to the motion in March of 2018. And EGLEI discussed those factors on in their August 2018 reply at 6 ER 1260 1212 and 1213. So even if Mr. Goldman's argument is correct, which I don't think it is because the district court itself said that the order was not terminating sanction, and that was at 4 ER 814 on the motion to reconsider, even if Mr. Goldman was correct that those factors had to be analyzed, the district court had those factors before it and presumably analyzed those factors before it rolled on August 30th. Well, it seems that if I that they fully complied with their reasonable interpretation of the district court's January 3rd 2018 order. And I hear appellant to be saying that the state of mind in not producing certain arguments should play a role in the analysis. I think he's saying it wasn't willful. Can you want to go toward willfulness? You look back to the first motions to dismiss that were filed in this case, and they contained an argument saying that EGLEI had offered no proof that there was any successor relationship between FIDERA and Santa Sofia, and at the very same time produced a redacted contract which omitted the fact that there had been a carryover of the prior season debt from FIDERA to Santa Sofia of some $400,000. And it was never disclosed until a year and a half after the lawsuit was filed and in and after both motions to dismiss had been ruled on by the who's not a party to this appeal was successful in part of the second motion to dismiss because they got a fraud claim dismissed against them based upon that redacted contract. It was the fact was simply not mentioned even though it was in the contract plainly before the court. So I would say that goes to willfulness, and certainly the district court had that in mind, and it was pointed out to the district court in several pleadings leading up to that August 30 sanction order. The other things we can go into are that yes, Mr. Goldman or the defendants produced lots and lots of documents. They never produced any written responses to the discovery request, so it was left to EGLEI to try and sort out and figure out what was going on with these documents that were being forwarded. And EGLEI on every occasion in the pleadings filled out the mandatory rule 37.1 local district court rule schedule, and those are all in the briefs for you. I can give you the sites to the record if you want to see them. And they produced what the interrogatory question was, what the response was, and what the deficiencies were. I can tell the court that as of August of 2018, in the August 24th reply to the motion for sanctions, EGLEI filed another rule 37.1 schedule outlining specifically with regard to each produced. And the main glaring lack of production on the part of Santa Sophia was that they had not produced their tax returns, nor had they produced their internal accounting journals, which would really tell somebody why income was received in the company and how expenses were booked when there had been checks and all sorts of things, financial statements, the general diary of the company, which is similar to the general ledger. These journals were omitted, and those were the key to determining everything else that went on in these companies. I will note for the court, FDARE never filed a written response to any discovery request, neither did Mr. Espinosa. That was noted in the pleadings. Santa Sophia filed one general objection to the discovery request, never supplemented those written responses to the discovery request, and just omitted documents, plain and simple. Can I ask you about the merits on the issue of best prices and self-dealing? The record contains invoices from your company that show that the very same shipment is sold to a related entity, and then on the very same day is sold to Kroger at a really substantial markup, almost 50%. How is there not, just on the face of that alone, a triable issue about best prices? You could have sold it directly to Kroger. You did it on the same day, but you ran it through the affiliated entity and scored a huge markup. Well, Your Honor, let me address that in a couple of ways. One sale on one day in the supply and demand situation, it's a spot market situation. The situations between the buyers and sellers can be very different. This is a summary judgment on the whole claim. Isn't that some evidence that, maybe it's not a lot, but there's some evidence of both a failure to get best prices and self-dealing, because if it's on exactly the same day, you clearly could have sold it out to Kroger. Let me answer that in two ways. First of all, the contract itself gives Eagle Eye the discretion to make sales. There's a long provision in the contract that says Eagle Eye can use its reasonable discretion to sell on whatever terms it needs to sell to move the product. The second thing about that analysis, Your Honor, is there was absolutely no opportunity to do any because the analysis that you were citing was submitted three months after the discovery. This isn't an analysis. This is your own documents. Yes, Your Honor. It's our own documents. Excuse me, Your Honor. Go ahead. Your own documents show the markup on the same day. You don't have to take discovery of yourself. You know why you marked it up and what the significance of that is. Are you suggesting the contract provision about discretion gives a defense against a failure to get best prices? Yes, Your Honor, I am. That's exactly what that provision is in the contract to eliminate these kinds of disputes. The agent, in this case, Eagle Eye's sales agent, is given very broad discretion in making sales. The reason those provisions are in the contract is exactly for this purpose, to obviate or answer the kinds of retrospective analysis of sales on a sale by sale basis, which the court is inviting us to get into. Well, what would have needed to be in the record to make that a disputed issue? What could have been in the record to make that disputed? I don't think anything in the record could have been in the record to make that a disputed issue because the contract disposes of it, I think, Your Honor, as a matter of law. On this record, it's not. But what sort of evidence could have been in the record to make something like that disputed? I mean, discretion generally is not completely unfettered. Yes, Your Honor, and I think you're correct. If there was some evidence that Eagle Eye was willful or grossly negligent in its sales, which I don't think this rises to, let's say Eagle Eye just took the product and dumped it in the dump or gave it away, okay? I think those things might be something in the record, but there's nothing in the record here. Also, to answer the panel's previous question and Judge Collins' question, also in the contract is the provision that you cited, which authorized Eagle Eye to sell to related entities. I will tell the court that with all candor, I don't know that Eagle Eye Grape Guys was the same corporate entity as was in the contract, but at least the plaintiffs had some notice that Eagle Eye was going to sell to related entities. Yeah, but the question is, so that last sentence says, grower acknowledges and approves the sale of the produce to companies related to distributor. Now, if you'd stop there, it might have included Eagle Eye Grape Guys, but then it says specifically Eagle Eye California and Eagle Eye Farms. The use of the term specifically may be a term of limitation rather than expansion, and the reason I say that is because the regulation associated with the Perishable Commodities Act says that you can only sell it, you cannot sell without specific prior authority. So the word specific is used both places, and if specific then becomes a term of limitation, you couldn't sell it to Eagle Eye Grape Guys if Eagle Eye Grape Guys is related, and given what's in the contract, it sure looks suspicious. Yes, Your Honor, I would respectfully disagree with the reading of the regulation. I think the regulation requires disclosure. I don't think it requires disclosure of the exact corporate entity that is involved, and under these facts, the plaintiffs did have notice that there were going to be sales to related entities. Do either of my colleagues have additional questions? All right, that concludes your time. Thank you. All right, Rebettal? Thank you. I said that I would come back to that sentence about related companies, and it turns out both contracts have that, but Your Honor focuses on the correct words specifically. I thought I heard you say including, which would not be limiting, but it says specifically. Second off, I wanted to point out that it's not just the Eagle Eye matter, but it also has to do with, and this is in my brief, the rebates of $121,000. The Eagle Eye was permitted to do rebates. You want to allow a marketer such as Eagle Eye to do that because sometimes with a rebate program, you can get higher prices, but when we drill down on the rebates, the $121,000 worth of rebates, what we discovered was that there were not rebates in any fair sense of the word. They were, quote, marketing fees. Now, this is a common tactic of marketers to essentially earn an additional profit center. Sometimes they call it handling, and you drill down, you ask what that is, and you come to find out one person in the company says you have to ask John, and John says you have to ask Susan, and the hot potato goes around. That's $121,000. What I'd like to do, and if there are any- Can you respond to, Judge Collins had a line of questioning regarding the different prices on the same day, and your colleague that represents appellees basically said, hey, we have broad discretion, and it's like the stock market. The fact that one was a higher price than the other, that's not enough. What's your response to that? As a very wise retired judge in California once told me, discretion, it means reasonable discretion, and what you have here is one sentence that refers to discretion followed by the next sentence that says that they are going to endeavor to obtain their best prices. It would be for a jury to essentially reconcile those two matters and to determine whether or not they were obligated to do exactly what the contract says, and as far as prices changing all the time, yes, that's true, but a jury, Eagle Eye would have a full opportunity to explain why it is that it could not obtain those prices going to bonds or other persons, or that the price changed from one day to the next, or as Judge Collins put it, sometimes it's on the same day. All right, your time is basically, you have, well, you're basically in overtime, so I want to make sure my colleagues don't have any additional questions. All right, they don't, so I'll give you 30 seconds to wrap up. Thank you. So, your honors, on the summary judgment, I understand that that's been the focus a lot of this question, but it was really painful in this matter insofar as the documents, and I ask that the court also take a close look, as I know you will, on that particular issue, and willfulness generally is determined by a hearing, is determined by a hearing. You're generally speaking, it's like you just have a hearing on it. We asked for hearings here, and you've got a gentleman in Mexico who's asked to turn himself upside down because of an allegation of the same property as used, not that it's fraudulent to do that, and if you take a look at the complaint, about 19 times it says upon information and belief, and the Ninth Circuit has spoken to that. That wouldn't be enough to pass muster on fraud, so you had weak allegations here, and if you put yourself in the position of a poor attorney like me, telling a client, he's got to find every single financial... All right, you're going into the longest 30 seconds ever. All right. I'm done, your honor. I'm sure I made my point. Thank you for your time. Thank you both for your argument. This matter will stand submitted.
judges: BYBEE, CALLAHAN, COLLINS